**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No. 1:21-cr-623 (CRC)** |
| **KIRSTYN NIEMELA,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Kirstyn Niemela to 11 months' incarceration (near the top of the applicable Guidelines range of 6 to 12 months' incarceration), one year of supervised release,[1] $500 in restitution, a fine of $3,672 (reflecting the amount of money raised on Niemela's behalf to cover her personal *and* legal expenses in this matter, using an appeal to donors focused on her participation in the January 6 riot at the Capitol), and the mandatory $70 in special assessments.[2]

### I.       Introduction

Defendant Kirstyn Niemela, a 35-year-old construction worker, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer

---

[1] For multiple misdemeanor convictions, the court can impose a maximum of one year of supervised release on each count. 18 U.S.C. § 3583(b)(3). Multiple terms of supervised release must run concurrently. 18 U.S.C. § 3624(e).

[2] By statute, Niemela must pay $25 for each of the two Section 1752 offenses, which are Class A misdemeanors, and $10 for each of the two Section 5104 offenses, which are Class B misdemeanors. 18 U.S.C. § 3013(a)(1)(A)(ii-iii).

of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[3]

After a four-day trial, the jury convicted Niemela of four crimes: one count each of violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly or Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct on Capitol Grounds or in any of the Capitol Buildings), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in any of the Capitol Buildings).

As explained herein, a sentence of 11 months in jail is appropriate in this case because Niemela: (1) repeatedly called for and supported violence against politicians in the days leading up to January 6, 2021; (2) entered the Capitol on January 6 through the Senate Wing Doors while a loud alarm was blaring and other rioters were entering the building through smashed-out windows adjacent to those doors; (3) responded to a Tweet immediately after entering the Capitol Building in a manner that demonstrated she knew her conduct and presence were unlawful and intended to disrupt Congress; (4) was part of three separate breaches of police lines—one in the Crypt, a second near the Memorial Doors, and a third just outside the House Chamber where members of Congress and their staff were sheltered in place—in which the mob threatened officers and then overran them; (5) entered the Rayburn Conference room and posed for celebratory photographs; (6) spent approximately 21 minutes inside the Capitol building; (7) suggested further violent confrontations with elected leaders were warranted long after January 6; (8) has never expressed remorse for her conduct on January 6 and claims she is a victim of this prosecution; and

---

[3] The approximate loss suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

(9) has one conviction and two arrests for crimes involving violent conduct before and after January 6.

The Court must also consider that Niemela's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers and disrupt the congressional proceedings. But for her actions alongside so many others, the riot likely would have failed. Considering all of the relevant factors, the government believes that a sentence of 11 months' imprisonment is warranted.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol contained in the background facts to which the parties stipulated at trial, Government's Trial Exhibit ("GEX") 1201.

### *Defendant Niemela's Role in the January 6, 2021, Attack on the Capitol*

On January 5, 2021, Niemela traveled from New Hampshire to Washington, D.C. along with her then-girlfriend, Stephanie Chiguer,[4] and friend, Mark Leach, to attend the "Stop the Steal" rally scheduled for January 6, 2021, at the White House Ellipse. Niemela came to Washington, D.C. to protest Congress's certification of the Electoral College vote for the 2020 presidential election.

In the days leading up to January 6, Niemela repeatedly made statements embracing and encouraging violence against lawmakers. For example, on January 3, 2021, she communicated on

---

[4] Chiguer was separately prosecuted in *United States v. Niemela, et al.*, 1:22-cr-25-APM, and pleaded guilty, via plea agreement with the government, to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). Chiguer's sentencing is scheduled for June 9, 2023, before Judge Mehta.

Facebook that she wanted "gitmo for all our government." *See* GEX 816. Later that same day, she

shared on Facebook an explicitly threatening Tweet from another Twitter user:



*Image 1: Tweet shared by Niemela on Facebook on January 3, 2021*

GEX 818. The next day, Niemela posted a photograph of a ballistic helmet with a sticker reading

"Kill the Deep State" and "WWG1WGA"[5] on it, GEX 820, and wrote "The shit coming out finally

is insane. Let's hang em high." GEX 821.

On January 5, 2021, Niemela, Chiguer, and Leach met co-defendant Michael Eckerman

and his cousin at their hotel in Washington, D.C. The next day, on January 6, 2021, the five of

them attended the "Stop the Steal" rally together. Niemela wore a black sweatshirt reading "We

the People Are Pissed Off," an American flag as a cape, and mirrored sunglasses. GEX 920.

---

[5] "WWG1WGA" stands for "Where We Go 1, We Go All," and is a slogan associated with the
QAnon conspiracy theory movement.



*Image 2: Chiguer (white outline) and Niemela (yellow outline) on January 6, 2021*

After the rally, Niemela and her companions, including Chiguer and Eckerman, walked to the U.S. Capitol. While on the west side of the Capitol grounds, they observed police officers wearing riot gear and attempting to contain the mob. They saw rioters fighting the police. They heard explosions. They smelled gaseous irritants. They walked past fencing that bore signs reading "AREA CLOSED By order of the United States Capitol Police Board" every few feet. GEX 203. Despite these clear signs that their presence on Capitol grounds was unlawful, Niemela was not deterred. To the contrary, she climbed a tree and took a "selfie" photograph that shows no one else near her on the grass beyond the fencing, making it obvious that she was within the restricted area of the Capitol grounds. *See* Image 3, below, GEX 823.4.  Moreover, while she and Mark Leach were standing just ten feet apart on the grass near the West Plaza, Leach was struck with a munition carrying chemical gas that burned his eyes and made it difficult for him to breathe. Tr. at 753:18-754:25.



*Image 3:  Selfie photograph taken by Niemela after she climbed up a tree within the restricted area, as denoted by the white "AREA CLOSED" signs on the fencing behind her*

Niemela, Eckerman, and Chiguer (hereinafter referred to as the "trio") thereafter took advantage of the mob's breaches of barricades and police lines and walked underneath scaffolding erected on the Capitol's West Plaza in preparation for the upcoming presidential inauguration. They then followed the mob up the northwest exterior stairs, leading them to the Capitol's Upper West Terrace. *See* Image 4, below.



*Image 4: Eckerman (blue box), Niemela (green box), and Chiguer (orange arrow) climbing the northwest stairs to the Upper West Terrace, as captured in video recorded by another rioter*

The trio walked past broken windows and entered the Capitol through the Senate Wing Doors at approximately 2:24 p.m., just 11 minutes after those doors first had been breached. *See* Image 5, below; GEX 102, 408.



*Image 5:  Niemela (circled in yellow) entering the Capitol building at 2:23:57 p.m. through the Senate Wing Doors as another rioter climbs through the broken window to her left*

At the time the trio entered the Capitol, loud security alarms were ringing, GEX 408, and rioters were climbing in through the broken windows, GEX 101, 102—both clear signs to Niemela that her entry was unlawful. In fact, only one minute after entering the Capitol building, Niemela responded to a Tweet from another Twitter user, *see* Image 6 below, which a friend shared with her via Facebook:



*Image 6:  Tweet to which Niemela responded immediately after entering the Capitol building*

GEX 822. In response to that Tweet, Niemela apparently sent her own video, which the government was unable to recover from a search warrant executed on her Facebook account,[6] though it appears based on context that it captured the destruction occurring at the U.S. Capitol, as her friends replied: "DO ITTTT;" "Take the shit down we're done;" and "Fk it all up." *Id*. In that context, Niemela's reply to the above Tweet directly demonstrates that she knew her conduct and presence were unlawful and intended to disrupt Congress.

### *Interior Breach #1: Niemela, Eckerman, and Chiguer Participate in Breach in the Crypt*

After entering the Capitol building, the trio turned right and entered the Crypt. There, they found a large crowd of rioters temporarily stymied by a group of approximately ten U.S. Capitol

---

[6] The Facebook search warrant return reflected that Niemela sent a video file during this private chat conversation, to which her friends reacted as described above, but the actual video itself was missing from the return—likely because Niemela deleted it or because Facebook later deactivated her account and failed to preserve video files pursuant to its content storage policies.

Police ("USCP") officers who had formed a line across the center of the Crypt, using their bodies to block the mob from further accessing the Capitol. GEX 502 at 00:00-00:45. For a brief time, the situation was a stalemate, though the officers were massively outnumbered. *Id.* After a few minutes, however, the mob of rioters—within which the trio was towards the back—surged forward, overwhelming the officers with the force of their collective bodies and breaching the police line. GEX 502 at 3:09. Dozens, if not hundreds, of rioters were ahead of the trio in this space; yet the trio still made their way through the crowd to within three feet of USCP Lt. Brooke Detorie, who testified at trial, and her trapped colleagues. *See id.*; *see also* GEX 104, Images 7 and 8, below.

 

*Image 7 (left):  Rioter footage capturing the line of outnumbered police officers blocking the mob from advancing through the Crypt*
*Image 8 (right): Niemela (circled in yellow) amongst the mob as it pushes through the police*

### Interior Breach #2: Eckerman—with Niemela and Chiguer Close Behind—Pushes Officer Near Memorial Doors, Leading to Breach and Rioter Dispersal Within the Capitol Building

The mob, including the trio, thereafter encountered a bottleneck. The Crypt exit funneled them into a small corridor near the Memorial Doors, a set of external doors to the Capitol which at that point was secure. GEX 105. Rioters stood shoulder to shoulder, filling the small room, as a group of approximately four USCP officers physically blocked the threshold. *Id.* Just beyond the officers was a stairway leading to the Speaker's Suite and the House Chamber. GEX 209, 210. Unsatisfied with being at the back of the mob, the trio wormed and maneuvered their way through

the crowd until they were at the front line of the stand-off between rioters and police officers. GEX 105 at 2:28:02 p.m.; *see also* Image 9, below.



*Image 9: Eckerman (red circle), Niemela (green box), and Chiguer (blue oval) worming their way through the stationary crowd to reach the front of the standoff with police officers, including Officer K.Y. (white oval)*

At the front of the standoff, Niemela directly observed police officers blocking her path to further penetrate the Capitol. Niemela and her fellow rioters quickly breached this police line, with Eckerman pushing Officer K.Y. to the ground.[7] GEX 503. The trio thereafter witnessed the space fill up with smoke, as another rioter discharged a fire extinguisher. *See* GEX 105, 410, 411, 505. Undeterred, Niemela took advantage of this second police line breach and ascended the nearby stairs to access the Capitol's second floor, with Eckerman leading the way followed by Chiguer. *Id*.; *see* Image 10, below.

---

[7] This incident underlies the § 111(a) charge to which Eckerman pleaded guilty.



*Image 10:  Niemela (circled in orange) and Eckerman (circled in white) just after the police line breach near the Memorial Doors*

**Interior Breach #3: Niemela Joins the Mob Surge Outside the House Chamber**
**While Terrified Members of Congress Shelter in Place**

The trio proceeded to the Statuary Hall Connector area of the Capitol, a corridor leading to the House Chamber. There, they encountered a now-familiar situation: a large crowd of rioters at another bottleneck in front of at least eight police officers using their bodies to form a police line. GEX 406; *see also* Image 11, below.



*Image 11:  Eckerman (circled in white) and Niemela (outlined in yellow) joining the mob confronting the police line outside the door to the House Chamber*

This was the most sensitive, high-stakes stand-off yet: the police were blocking the rioters from reaching the elected officials gathered in the House Chamber to certify the results of the 2020 presidential election. GEX 414. The trio stood in the second or third row of the mob confronting the officers for approximately five minutes, as members of the crowd standing right next to Niemela shouted at the officers and demanded they stand aside to allow the mob to fully occupy the building, confront the "traitors"—i.e., members of Congress—and "drag 'em out." GEX 406, 407, 409, 414.

Meanwhile, inside the House Chamber, many members of Congress and their staff remained sheltered in place—some terrified, some preparing for hand-to-hand combat with rioters, all knowing that they were the targets of the mob's anger. In an effort to protect them, USCP plain clothes officers inside the House Chamber barricaded its main door with furniture and stood guard with their guns drawn. GEX 416. The situation was obviously tense and scary. *See id.* and Image 12, below.



*Image 12:  USCP officers inside the House Chamber with the door barricaded and guns drawn*

After a few minutes, the mob, including Niemela, grew impatient and surged forward, overwhelming this third set of police officers, pushing them aside, and giving the rioters control of the hallway outside the House Chamber. Niemela watched for several minutes as rioters chanted

"Stop the Steal!" and banged on the door to the House Chamber, sometimes with flag poles. GEX 406, 407, 409, 414.

### *Posing for Celebratory Souvenir Photographs Inside the Rayburn Conference Room*

The trio then walked down the hallway and entered the Rayburn Conference Room, where they posed for celebratory photographs in front of a portrait of George Washington. *See* Image 13, below.



*Image 13:  Niemela (sunglasses), Eckerman, and Chiguer posing for a selfie in the Rayburn Conference Room*

The trio left the conference room and continued their march down a hallway and past a clearly marked exit via the East Front House doors, which were open to the outside.  A few minutes later, they turned back and exited the building through those doors. In total, Niemela spent approximately 21 minutes inside the Capitol and participated in three breaches of police lines.

In the days after the riot, Niemela expressed no remorse for her conduct at the Capitol and even suggested further violent confrontations with elected leaders were in order.  For example, on

January 8, 2021, she replied on Facebook to a friend who congratulated her for protesting at the Capitol, "if it ain't fixed we going back locked and loaded. We will take back our country." GEX 830.   On January 10, 2021, she sent posts depicting conspiracy theories about a child sex trafficking ring involving leaders of a political party and the Pope to friends on Facebook, again suggesting "Let's hang em all." GEX 835.

<em>Niemela's Statements</em>

Niemela did not testify at trial.

Since trial, Niemela has given multiple media interviews in which she has disparaged the Court, the jurors, the government, and her own attorneys, as well as refused to accept any responsibility or express any remorse, despite the jury's verdicts. *See, e.g.*, "Justice in Jeopardy," available at https://rumble.com/v27s6c4-j6-kirstyn-niemela-treniss-evans-condemnedusa-sing4freedom-justice-in-jeopa.html (last accessed May 18, 2023). For example, in an interview she gave the week after trial, she falsely complained that she did not receive "a pretrial" to discuss and resolve her pending motions. Compare *id.* and Jan. 26, 2023 Minute Order (denying the motions following a pre-trial conference). She stated that her lawyers were "absolutely useless" and accused them of conspiring with the government. She asserted that she had been "railroaded" by, among other means, the Court's handling of jury selection, in which she said the Court ignored jurors' explicit statements indicating that they were unsure if they could be fair and impartial. *Id.* She stated that the Court struck four or five jurors just to "show it wasn't 100% corrupt." *Id.* She accused the government of lying to the Court and jurors about the "convenien[t]" absence of videos from her Facebook search warrant return, stating "they had my videos; they probably just tell a different story than what you painted in court." *Id.* She said the FBI agent "lied on the stand." *Id.* She also complained that she and fellow January 6 defendant Richard Barnett were "robbed of all

14

of our due process [and] constitutional rights," and predicted that a future lawsuit by January 6 defendants would result in "the largest payout in U.S. history." *Id.* She ended by thanking the producers of the broadcast for "not forgetting about all of us American patriots suffering." *Id.*

In addition, Niemela's mother created a fundraising website for her on GiveSendGo (https://www.givesendgo.com/FreeKirstyn) seeking money to cover Niemela's personal expenses—such as new clothes for court, gas, tolls, parking, and a hotel room during trial—in addition to legal expenses associated with her newly-retained attorney. The website is titled "Support for J6 Freedom Fighter" and features a photograph of Niemela as the header. *Id.* The narrative underneath appeals to donors by falsely describing Niemela as a "a victim of political persecution, slander and libel" who on January 6 merely "exercise[ed] her First Amendment rights to peaceably assemble" when she "followed her friend in [to the Capitol building] through an open door, unimpeded" and exited the moment she "noticed some nefarious activities taking place." *Id.* The narrative further asserts that during trial "the prosecutors were allowed to submit into evidence and show videos, social media posts, and texts in open court" that were taken out of context or attributable to other people, and that the government's "despicable tactics only prejudiced the already bias [*sic*] DC jury even more." *Id.* The website reflects that as of May 18, 2023, she has raised $3,672 and indicates "[t]he funds from this campaign will be received by Kirstyn Niemela." *Id.*

Based on her interviews and GiveSendGo narrative, it is clear that Niemela continues to believe that she, and rioters like her, are the real victims of January 6.

*The Charges and Verdict*

On January 14, 2022, the government charged Niemela by criminal complaint in *United States v. Niemela, et al.*, 1:22-cr-25-APM, along with co-defendant Chiguer, with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly or Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct on Capitol Grounds or in any of the Capitol Buildings), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in any of the Capitol Buildings). All four crimes are misdemeanors.

On January 19, 2022, Niemela and Chiguer were formally charged by Information with the same four crimes. *See id.*, ECF No. 11. On April 7, 2022, Chiguer pleaded guilty to one count of violating 40 U.S.C. § § 5104(e)(2)(G) pursuant to a plea agreement. *See id.*, ECF No. 36.

Approximately three weeks later, on April 27, 2022, a grand jury seated in Washington, D.C. indicted Niemela and Eckerman in a separate case, *United States v. Eckerman et al.*, 21-cr-623 (CRC). The indictment charged both Niemela and Eckerman with the same four misdemeanor crimes but also charged Eckerman with multiple felonies. *See id.*, ECF No. 24. Judge Mehta granted the government's motion to dismiss all charges against Niemela in the original case with Chiguer, 1:22-cr-25-APM, *see id.*, ECF Nos. 38-39, leaving Niemela charged only in the instant case before this Court.

From January 23-26, 2023, this Court conducted a jury trial of Niemela. The jury convicted Niemela on all four counts.

## III.     Statutory Penalties

Niemela is before this Court pending sentencing on her violations of 18 U.S.C. § § 1752(a)(1-2) and 40 U.S.C. § § 5104(e)(2)(D and G). Niemela faces up to one year of

16

imprisonment and a fine of up to $100,000 on each of the two § 1752 offenses and up to six months of imprisonment and a fine of up to $5,000 on each of the two § 5104 offenses. The Court may also order Niemela to pay restitution, but it is not mandatory.  *See* 18 U.S.C. § 3663(a)(1)(A).

Because the two § 1752 offenses are Class A Misdemeanors, the Sentencing Guidelines apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9. The Sentencing Guidelines do not apply to the § 5104 offenses, however, because they are both Class B Misdemeanors. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR includes an error, albeit one that does not affect the Guidelines calculation. Specifically, the PSR does not include a separate Guidelines analysis for both of the § 1752 offenses of which Niemela was convicted. *See* PSR ¶¶ 43-60. Sections 1B.1(a)(1)-(3) of the Guidelines describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set

out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The PSR does not follow these steps.  It concludes (*see* PSR ¶ 49) that Counts One and Two group but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). Ultimately, however, that omission does not affect the calculation of the Guidelines range. Counts One and Two, which involve the same victim (Congress), group. *See* U.S.S.G. § 3D1.2(a).  The offense level for the group is the offense level for Count Two, which is the highest level of those two counts. *See* U.S.S.G. § 3D1.2(c). The total offense level is therefore 10. Because Niemela's criminal history category is I (based on one criminal history point), her Guidelines range is 6 to 12 months' imprisonment.

## IV.        Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 9 months' imprisonment, one year of supervised release, $500 in restitution, and the mandatory $70 in special assessments.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy. *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp.3d 1, 8 (D.D.C. 2021). While assessing Niemela's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Niemela, the absence of violent or destructive acts is not a mitigating factor. Had Niemela engaged in such conduct, she would have faced additional criminal charges.

The Court can and should infer from the evidence presented at trial that Niemela saw and disregarded repeated signs that her presence on Capitol grounds was unlawful and unwelcome, including barricades and fencing with "AREA CLOSED" signs and gaseous irritants deployed just a few feet from her.  Indeed, Niemela *must* have noticed a munition flying through the air, landing on the ground just ten feet away from her, and releasing a chemical that stung her travel companion's eyes and inhibited his breathing. Moreover, to get inside the Capitol building, Niemela had to walk under torn sheeting and scaffolding and ignore both broken windows and a blaring security alarm. None of these things deterred her. She knew exactly what she was doing, as she acknowledged. *See* GEX 822.

Once inside the building, Niemela participated in three separate breaches of police lines, each time getting closer to the front of the mob. While she did not physically use force against any officer—if she had, she would have been charged accordingly—she purposefully added her body to the mass of the mob, whose strength was its sheer numbers. She penetrated further and further

into the Capitol building, eventually breaching the police line just outside the House Chamber, creating one of the most dangerous moments of the entire riot as members of Congress sheltered inside and police officers with guns drawn guarded the furniture-barricaded doors.

The evidence presented at trial overwhelmingly established that at the time Niemela entered the Capitol building, she knew that Congress was inside working to certify the results of the 2020 presidential election. Niemela must have understood that a mob of rioters breaking into the building would disrupt Congress's work. This did not deter her either. In fact, Niemela's social media communications reveal that this was her goal.

Niemela's conduct was thus significantly worse than most misdemeanor-only January 6 defendants. Her criminal conduct was not limited to unlawfully entering and remaining inside the Capitol. She did not merely walk around the building or take photographs. Niemela's social media communications in the days leading up to January 6, 2021, and on the day itself—specifically, her posts advocating violence against politicians gathered at the Capitol on January 6 for supporting what she viewed as a stolen election—arguably established that she had knowledge of the certification proceedings slated to take place in the Capitol building that day and the intent to disrupt those proceedings. And her conduct inside the Capitol building—particularly her participation in the breach just outside of the House Chamber while members of Congress and their staff sheltered inside—undoubtedly *did* disrupt Congress's Joint Session.

The crimes of which she was convicted warrant the recommended term of incarceration, particularly given her lack of remorse and continued attempts to blame others for the January 6 riot, even after the jury's verdict.

20

### B.  Niemela's History and Characteristics

Niemela's criminal history contains a prior conviction for disorderly conduct that involved violence.  She was arrested on two other occasions, but not convicted, based on reports that she engaged in violence.

In 2019, Niemela entered a bar/restaurant, already intoxicated, and yelled racial slurs. PSR ¶ 63. "When asked to leave, Ms. Niemela's behavior escalated." *Id.* The bar/restaurant's owner forced her outside and locked the establishment's door to prevent Niemela from re-entering. *Id.* In the process, Niemela pushed another individual. *Id.* Police arrested Niemela and charged her with disorderly conduct, to which she later pleaded guilty. *Id.* Niemela's then-fiancée, who arrived on scene after police, reported that Niemela "is aggressive when she is intoxicated . . . frequently causes issues [at that same bar/restaurant and] . . . has a problem with authority." *Id.*

In 2012, police charged Niemela with simple assault after she and a group of women got into an argument with another woman at a club, followed up later that night by walking to the woman's house, and confronted her. PSR ¶ 69. There, outside the woman's house, Niemela assaulted the victim while another woman restrained the victim's hands and arms. *Id.* Police observed that the victim was bleeding from her nose and mouth when they arrived on scene.  The case was later dismissed for lack of prosecution. *Id.*

Niemela was arrested again for violent behavior in May 2021 after trying to fight security personnel at a hospital. PSR ¶ 64. Niemela, who appeared to be intoxicated, entered the hospital and provided names of two different patients she was there to see; neither was on the hospital's patient list. *Id.* When hospital staff informed Niemela that she needed to put on a mask, "she became belligerent and shouted vulgarities" but eventually complied. *Id.* Niemela's temper reignited when hospital staff asked her if she knew where she was going. Niemela launched into a

torrent of profanity and a tirade "about the effectiveness of masks and vaccines." *Id.* Hospital security eventually had to remove Niemela from the building and restrain her until police arrived. *Id.* Ultimately, the case was resolved by being "placed on file without finding and good behavior for one year." *Id.*

Niemela's aggression and problems with authority, as evidenced by her criminal history and the observations of her former fiancée, were on full display during the riot at the Capitol and her conduct inside the building. Further fitting the pattern, Niemela has refused to be interviewed by Probation, sign releases or submit the financial paperwork necessary for the pre-sentence investigation process. *See* PSR ¶¶ 72, 81.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Bustle et al.*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 21-cr-41 (CJN), Tr. 10/13/2021 at 37 (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Niemela's actions during and after the riot demonstrate the need for specific deterrence. First, as discussed above, she failed to heed repeated clear signs that her presence on the Capitol grounds—let alone her entry into the Capitol building itself—was unlawful. Given that the barricades, use of non-lethal crowd control measures (e.g., chemical irritants), broken windows, a door alarm, and lines of police officers blocking her path did not deter her, a significant sentence is warranted. Worse, Niemela continued to threaten and call for violence *after* January 6. GEX 830 ("if it ain't fixed we going back locked and loaded. We will take back our country."); GEX 835 ("Let's hang em all."). And she has expressed no remorse whatsoever, despite the jury's verdict. To the contrary, her post-verdict commentaries illustrate that she believes she is the victim in all this.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress, to seditious conspiracy.[8] This Court must sentence Niemela based on her own conduct and relevant characteristics but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

The jury found Niemela guilty of four crimes: violations of 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, … I am being asked to give a sentence well within

---

[8]  A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Here, the pool of comparable cases is severely limited.

To date, only five defendants have been sentenced after having taken their cases to trial and been found guilty solely of misdemeanors. Those cases are *United States v. Jesus Rivera*, 21-cr-60 (CKK) (sentenced to 8 months of incarceration); *United States v. Russell Alford*, 21-cr-263 (TSC) (sentenced to 12 months of incarceration); *United States v. Hector Vargas Santos*, 21-cr-47 (RDM) (sentenced to 4 months of incarceration); *United States v. John Nassif*, 21-cr-421 (JDB) (sentenced to 7 months of incarceration); and *United States v. Mick Chan*, 21-cr-668 (TNM) (sentenced to 3 months of incarceration followed by 5 months of home confinement). While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the cases described below provide the best available comparisons to the relevant sentencing considerations in this case. *See United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006) (In considering disparity, a judge cannot "consider all of the sentences not yet imposed . . . The most a judge can do is consider those other sentences that do exist.").

The most analogous case is *Alford*, in which the jury convicted the defendant of the same four misdemeanor offenses as Niemela: 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). *See Alford*, No. 21-cr-263 (TSC), ECF No. 94 (Verdict Form). On January 6, Alford, like Niemela, repeatedly walked past and ignored signs that the Capitol building

and grounds were restricted, entered the Capitol through a door other rioters had broken into while an alarm sounded, refused to leave the Capitol even after clear police orders to do so, celebrated his participation on social media, and spread disinformation about the riot on social media. Judge Chutkan sentenced Alford to the statutory maximums of 12 months' imprisonment on the 18 U.S.C. §§ 1752 convictions and 6 months' imprisonment on the 40 U.S.C. §§ 5104 convictions, all to run concurrently. *See id.*, ECF No. 110 (Judgment).

The Court should also consider the sentence imposed in *Rivera*, No. 21-cr-60 (CKK), where the defendant was convicted after a bench trial of the same four misdemeanor offenses as Niemela and Alford. *See Rivera*, No. 21-cr-60 (CKK), ECF No. 62 (Findings of Fact and Conclusions of Law). Rivera filmed the assault on police at the Lower West Terrace and the breach of the police line as officers unsuccessfully attempted to block rioters from accessing the Upper West Terrace. He encouraged rioters climbing the walls to the Upper West Terrace, yelling to them that "there's an easier way up!" Rivera then took advantage of the breach, ascended the same exterior stairs as Niemela, and entered the Capitol building by climbing through a broken window adjacent to the Senate Wing Door. Rivera spent approximately 20 minutes inside the building, live-streamed the riot from inside, celebrated the riot and the destruction of property as it was ongoing, and urged his followers to share his broadcast. In the days after the riot, Rivera demonstrated no remorse or contrition for his acts. Instead, he mocked the pain and trauma suffered by victims and celebrated his participation in the riot in public posts on his social media accounts. For this conduct, Judge Kollar-Kotelly sentenced Rivera to eight months in prison. *Id.*, ECF No. 82.

Alford had one aggravating factor that Niemela did not. Alford testified at trial, and did so dishonestly.[9] All three defendants spent approximately the same amount of time inside the Capitol building. Nevertheless, Niemela's conduct on January 6 was much worse than either Alford's or Rivera's. Neither Alford nor Rivera participated in any breaches of police lines, whereas Niemela participated in <u>three</u>, two of them from the front of the mob. She also penetrated deeper into the Capitol than either Alford or Rivera and, by her participation in the breach just outside the House Chamber, contributed more to the danger and trauma experienced by members of Congress and their staff. These aggravating factors significantly elevate her offense conduct vis-à-vis Alford and Rivera and thus justify the government's recommended sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

---

[9] Alford gave false testimony about the reasons for his travel to D.C. and his reaction to learning of the riot on the news—testimony belied by his Facebook records. *See Alford*, No. 21-cr-263, ECF No. 108 at 16 n.7.  The government accordingly sought, and Judge Chutkan applied, a 2-level sentencing enhancement for Obstructing or Impeding the Administration of Justice pursuant to U.S.S.G. § 3C1.1.  This resulted in a Guidelines range for Alford of 10 to 16 months' imprisonment.

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

Here, the victim of Niemela's trespassing offense was the entity with a possessory interest in the Capitol Building, which is the Architect of the Capitol Building. Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Niemela to pay $500 in restitution for her conviction on the § 1752(a)(1) count. This amount fairly reflects Niemela's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging

property. Accordingly, such a restitution order avoids sentencing disparity.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Niemela to 11 months in jail, one year of supervised release, $500 in restitution, a fine of $3,672, and the mandatory $70 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Niemela's liberty as a consequence of her unlawful conduct.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        */s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
601 D St., NW
Washington, D.C. 20001
Tel. No. (813) 274-6370
michael.gordon3@usdoj.gov

*/s/ Jessica Arco*
JESSICA ARCO
D.C. Bar No. 1035204
Trial Attorney, Detailee
601 D St., NW
Washington, D.C. 20001
Tel No.: (202) 514-3204
jessica.arco@usdoj.gov